Filed 7/18/16  P. v. Campbell CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B256272 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA097490) |
| v. | |
| ERICA ARTAVIA CAMPBELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Peter A. Hernandez, Judge.  Affirmed as modified.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, William H. Shin and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Erica Artavia Campbell appeals from a judgment entered after a jury found her guilty of second degree murder. The trial court sentenced her to 15 years to life in prison. Campbell contends (1) the trial court committed reversible error in denying her *Batson/Wheeler* motion,[1] (2) there is insufficient evidence of malice aforethought to support her second degree murder conviction, and (3) the trial court committed reversible error in declining to instruct the jury on voluntary manslaughter based on provocation and heat of passion. For the reasons explained below, we reject each of these three contentions. Campbell also contends, and the Attorney General concedes, she is entitled to two additional days of actual presentence custody credit. We modify the judgment to correct Campbell's custody credits. As so modified, we affirm the judgment.

## BACKGROUND

On April 2, 2012, around 2:00 a.m., Campbell stabbed her boyfriend, Markeon Taylor, and he died as a result of the stab wound to his chest. At trial, Campbell did not deny she stabbed Taylor, but she disputed she committed murder. She argued theories of self-defense, voluntary manslaughter (imperfect self-defense), and involuntary manslaughter (brandishing a weapon with criminal negligence causing death, and unconsciousness due to voluntary intoxication), and the trial court instructed the jury on each of these theories.

**Prosecution Evidence**

On April 1, 2012, leading up to the incident, Campbell had been drinking alcohol at the apartment in Pomona she shared with various relatives and Taylor. Some time before midnight, Taylor left the apartment with Leroy Jefferson (Campbell's brother), Marcus Evans (Campbell's cousin), and Markael Ballou (Jefferson's friend). It was Taylor's birthday, and the men planned to go to a club to celebrate. Campbell stayed at the apartment. According to Ballou, when Taylor told Campbell he was going out, Campbell asked why and began arguing with Taylor.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

2

Some time after midnight, the men returned to the apartment. Appellant and the men socialized as they drank alcohol. About an hour later, Campbell and Taylor began arguing in the kitchen. Ballou was in the kitchen area of the apartment during their argument. Ballou saw Campbell push Taylor. Taylor yelled out for Jefferson to come and control Campbell. Jefferson stepped in between Campbell and Taylor and he pushed Taylor against the refrigerator.[2] According to Ballou, Campbell quickly approached Taylor, brushing against Ballou's back and pushing him forward as she went by. Campbell was standing in front of Taylor when Ballou saw Taylor grab his chest. Ballou heard Taylor say, "She stabbed me. I can't believe she stabbed me." Taylor fell to the floor and did not get back up. Ballou heard Campbell apologize to Taylor.

Evans was in the bathroom when he heard a commotion and Campbell's "elevated scream." He rushed out of the bathroom and into the kitchen where he found Taylor on the floor, bleeding. Evans dialed 911. According to Evans, Campbell was hysterical. She was crying and appeared worried about Taylor.

When officers arrived, they recovered a bloody kitchen knife that was on the floor between Campbell and Taylor. The blade of the knife measured approximately three and one-half inches.

Taylor died from the stab wound to his left chest. According to the deputy medical examiner, the wound was three inches deep and penetrated Taylor's skin, muscle, chest wall, lung, and heart. The direction of the wound was "front to back, right to left, slightly downward." The deputy medical examiner did not find any defensive injuries on Taylor's body.

Pomona Police Department Detective Jerry Uribe interviewed Campbell shortly before 4:00 a.m. on April 2, 2012. A videotaped recording of the interview was played for the jury. According to Uribe, Campbell did not appear intoxicated when he

---

[2] As set forth below, Jefferson testified for the defense and denied he was in the kitchen at the time of the stabbing. Ballou, testifying for the prosecution, stated he and Jefferson were in the kitchen when Taylor was stabbed.

3

interviewed her. Campbell told Uribe she was "drunk as hell" when Taylor was stabbed and she did not know how it happened. She initially denied stabbing Taylor.

Later in the interview, Campbell told Uribe that Taylor was stabbed when she and Taylor were "tussling over the knife." Campbell stated she and Taylor began arguing in the kitchen because she "felt like he was disrespecting [her]. He felt like [she] was disrespecting him." They started hitting each other. Taylor pushed her and she fell. Her stomach hurt and she felt scared. Her "first instinct" was "to protect [herself]." She stood up and grabbed a knife from the kitchen counter. She shouted something like, "fuck you, don't touch me. Don't fucking ever touch me again." Taylor approached her and grabbed the knife. Campbell wrestled him for it. When she tried to push him, the knife stabbed him.

Detective Uribe interviewed Campbell again two days later on April 4, 2012. Campbell stated Taylor did not push her down when they were arguing in the kitchen immediately before he was stabbed. He pushed her down earlier when they were arguing in the bedroom. She heard him refer to her as a "bitch" when he was talking on the telephone, so she entered the bedroom to confront him. She told him not to talk about her, and she "put [her] hand in his face." He grabbed her wrist, twisted it, and "tossed [her] on the floor." She tried to stand up. He "grabbed [her] by the neck and threw [her] on the floor harder." Her brother (Jefferson) and the others heard her hit the wall, so they rushed into the room. Jefferson grabbed her and Evans grabbed Taylor. Jefferson and Evans told them to calm down. Campbell went into another room and closed the door, but Taylor kept "nitpicking." They both went to the kitchen and the arguing continued. Campbell told Taylor, "'Shut the fuck up. You can leave.'" She wanted him to leave because their "arguments [had] been getting physical." This was not the first time he held, grabbed, choked, and pushed her.

Detective Uribe asked Campbell, "when you grabbed that knife, did he [Taylor] do anything to deserve that?" Campbell responded, "It was just a little – just a little shove, like 'Out of my face.'" After Taylor gave her a little shove, Campbell grabbed the knife

4

from the counter. She punched Taylor once with both hands as she held the knife with both hands.

**Defense Evidence**

Campbell testified at trial. She stated that, on April 1, 2012, she started drinking alcohol when she first woke up and continued drinking alcohol throughout that day and into April 2, 2012. She described the altercation in the bedroom as follows: "We had a fight in my bedroom. He twisted my arm. He threw me to the floor and I got back up. He threw me to the floor again and he choked me, and then I got up and he threw me into the wall." Campbell was unable to breathe when Taylor was choking her and she felt scared. Jefferson came into the room and told Campbell to go into his (Jefferson's) room. Campbell told Jefferson she wanted Taylor to move out of the apartment because she "was tired of him choking [her]." Campbell stated that Taylor had choked her between five and 20 times during the two months they lived together prior to the stabbing.

After the altercation in the bedroom, Campbell went into the kitchen to smoke a cigarette. Taylor came into the kitchen and they started arguing again. Campbell testified: "And then I got in his face, and he pushed me." At that point, she "just had a reaction to defend [herself]." She "felt a little scared because a few minutes prior to that, he had choked [her]." She was not angry. Campbell stated that she did not remember grabbing the knife or stabbing Taylor. She was experiencing a "blackout" as a result of her alcohol consumption. Later, she testified that she believed her statements to Detective Uribe about how the stabbing occurred were true—that she punched Taylor with both hands while holding the knife in both hands as they tussled over the knife. She denied that she intentionally stabbed Taylor.

Campbell's brother, Jefferson, testified in her defense. He stated the altercation in the bedroom between Campbell and Taylor occurred about one hour prior to the stabbing. He denied he and Ballou were in the kitchen when Taylor was stabbed. He stated they were in the living room playing video games, facing away from the kitchen.

5

**Verdict and Sentence**

The jury found Campbell guilty of second degree murder. The trial court sentenced Campbell to 15 years to life in prison.

**DISCUSSION**

*Batson/Wheeler Motion*

Campbell, an African-American woman, contends the trial court erred in denying a *Batson/Wheeler* motion she made after the prosecutor exercised a peremptory challenge to excuse an African-American woman.

**Proceedings below**

After the prosecution exercised its fourth peremptory challenge on Juror No. 9711,[3] Campbell's counsel made a *Batson/Wheeler* motion. The following exchange occurred between the trial court and the parties:

"The Court: Tell me the reason why, because I don't see a pattern.

"[Defense counsel]: Well, there is -- there isn't a pattern. She's -- basically Juror No. [9711] is the sole Black female on the jury panel. There's one Black male who has not been questioned yet.

"The Court: And there's a third Black person in there as well in the prospective panel. I think it's a male.

"[Defense counsel]: I have not seen a third Black, but it's denying my client a right to a jury of her peers. To just exclude this lone female, the only female that is currently on the panel of people who have been questioned, and there's no reason that she

---

[3] In providing the required biographical information during voir dire, Juror No. 9711 stated she lived in Covina, was employed as a science teacher, was married to a man who worked in the information technology department at Kaiser, and did not have children. She had never served on a jury although she had reported for jury duty. Her mother was an attorney who no longer practiced and her former roommate was an attorney who practiced corporate law. In responding to a question from the trial court to all prospective jurors about whether anyone close to them had been killed by another person, Juror No. 9711 stated two of her cousins had been killed. She was not asked to provide further details about the killings.

has given in terms of her responses to my questioning, the court's questioning or prosecutor's questioning, which would justify her being excused.

"The Court: But this is the peremptory challenge stage. Unless there's some sort of pattern or some sort of inference of a pattern that [the prosecutor] is excluding individuals because of their race, the court then would initiate the process to ask [the prosecutor] for any nonracial reasons. [¶] I'm still going to ask her, but I don't necessarily think that, at this stage, there's a *Batson* or *Wheeler* issue. [¶] But I will hear from [the prosecutor].

"[The prosecutor]: Thank you. [¶] Aside from not having the prima facie showing, the People's concern is that she [Juror No. 9711] indicated she was only paid for five days. But our jury sheet indicates she has unlimited -- an unlimited number of days. In my experience, especially teachers usually in the public school system do get that.[4] [¶] In addition [during] counsel's voir dire on self-defense, her statement was if she did kill someone in self-defense, she was not going to lose sleep over it.[5] So it would be for those reasons, Your Honor, that the peremptory was exercised.

"The Court: [Defense counsel], did you want to respond?

"[Defense counsel]: She did say that in response to my questioning. And I would just add that there can be a pattern, since she basically is the only Black female who has

---

[4] In response to a question from the trial court about "school commitments" that would conflict with jury service, Juror No. 9711 stated, "I'm a district teacher, and I'm only paid for five days." The court inquired if Juror No. 9711 could work part-time if she were required to serve on the jury. Juror No. 9711 agreed to ask her employer about that. When the court asked for the name of the district where she worked, Juror No. 9711 responded, "Green Dot Public School charter District in L.A.U.S.D. [Los Angeles Unified School District]" at the Oscar De La Hoya campus.

[5] When Campbell's counsel asked Juror No. 9711, "self-defense, how do you feel about that," she replied: "I feel self-defense is okay. I mean, if someone is coming after me, I'm going to do what I have to do. My last intention is not to kill them, but if they die, then they die, I guess. I'm not going to lose sleep over it for too long."

7

been questioned or Black person peer who has been questioned, so -- but that's submitted.

"The Court:  Right.  And I agree.  She's the only Black female.  And let's be clear, she's the only Black female on this panel, and this is the panel that has been drawn up from, you know, the community that we're in, or based on the criteria that the court has set up.  [¶]  I don't necessarily think there's a pattern, but I don't necessarily think [the prosecutor] should be prohibited from excluding someone on a peremptory based on a nonracial reason if she's articulated those reasons.  [¶]  The *Wheeler/Batson* motion will be denied."

**Applicable law**

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race.  (*Batson*, *supra*, 476 U.S. at p. 97; *Georgia v. McCollum* (1992) 505 U.S. 42, 59; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)  Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article 1, section 16 of the California Constitution." (*People v. Lenix* (2008) 44 Cal.4th 602, 612.)  "The *Batson* three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]  The three-step procedure also applies to state constitutional claims." (*Id*. at pp. 612-613.)

"[W]here (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's

8

nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling." (*People v. Scott* (2015) 61 Cal.4th 363, 391.)

**Analysis**

Campbell attempted to establish a prima facie case of discrimination by pointing out Campbell is an African-American woman, the prosecutor exercised a peremptory challenge on Juror No. 9711, the sole African-American woman in the venire, and none of Juror No. 9711's responses to questions warranted her excusal.

A "court reviewing a first-stage ruling that no inference of discrimination exists 'may consider apparent reasons for the challenges discernible on the record' as part of its 'consideration of "all relevant circumstances."'" (*People v. Scott*, *supra*, 61 Cal.4th at p. 390.)

Despite Campbell's assertion to the contrary, one of Juror No. 9711's responses stands out in the record as a race-neutral reason for the peremptory challenge. As set forth above, in responding to a direct question from Campbell's counsel regarding her "feel[ings] about" self-defense, Juror No. 9711 replied: "I feel self-defense is okay. I mean, if someone is coming after me, I'm going to do what I have to do. My last intention is not to kill them, but if they die, then they die, I guess. I'm not going to lose sleep over it for too long." The focus of Campbell's defense case was self-defense. Although other prospective jurors stated they would use self-defense if they felt their lives were at risk, none expressed such a nonchalant attitude about taking someone's life in self-defense.[6]

---

[6] We are not conflating the first-stage *Batson/Wheeler* analysis—whether Campbell established a prima facie case of discrimination—with the third stage analysis—whether the prosecutor's proffered nondiscriminatory reasons for exercising the peremptory challenge are genuine—even though the prosecutor cited Juror No. 9711's response to the self-defense question as a reason for excusing her. Regardless of whether the prosecutor cited this as one of her reasons, Juror No. 9711's response to the self-defense question independently stands out in the record as a race-neutral reason for her excusal, especially given that one of the key elements of Campbell's proffered prima

Based on the circumstances demonstrated in the record at the time Campbell made her *Batson/Wheeler* motion—this was the first challenge the prosecutor made to an African-American juror, the prosecutor had not excused the other African-American juror who had been questioned, and, most importantly, there was an obvious reason for Juror No. 9711's excusal in her response to the self-defense question—we conclude the trial court did not err in finding no prima facie case of discrimination.

**Sufficiency of Evidence of Malice Aforethought**

Campbell contends there is insufficient evidence of malice aforethought to support her second degree murder conviction.

As the trial court instructed the jury, "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express malice* if she unlawfully intended to kill. [¶] The defendant acted with *implied malice* if: [¶] 1. She intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time she acted, she knew her act was dangerous to human life; [¶] AND [¶] 4. She deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time." (CALCRIM No. 520.)

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the

---

facie case was Campbell's assertion that none of Juror No. 9711's responses to questions stood out as a reason justifying her excusal.

10

determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] . . . """"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."" [Citations.]""" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

There is substantial evidence of express malice (intent to kill) in the record. Campbell grabbed a knife and stabbed Taylor in his left chest, leaving a wound three inches deep that penetrated Taylor's skin, muscle, chest wall, lung, and heart. The location of the wound and the force with which Campbell had to stab to insert the knife three inches into Taylor's chest indicate intent to kill.

Campbell's own statements to Detective Uribe are substantial evidence of implied malice. During her second interview, Campbell stated she "punched" Taylor while holding the knife in both hands. Death is a natural and probable consequence of Campbell's intentional act. It is inconceivable Taylor did not know her act was dangerous to human life. Taylor acted with conscious disregard for Taylor's life when she punched him while holding a knife in both hands.

Campbell cites *People v. Collins* (1961) 189 Cal.App.2d 575, 591 for the proposition, "The prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary." Campbell asserts there was no evidence of malice based on her "uncontroverted" statements that "she loved Markeon Taylor and did not intend to hurt him . . . and that she only acted to defend herself." Here, however, the jury was free to reject Campbell's self-defense theory and doubt the credibility of these statements. As set forth above, the manner in which Campbell stabbed Taylor indicated she intended to hurt him and the prosecution presented evidence (e.g., Ballou's testimony) indicating

11

Campbell did not act in self-defense. The record contains substantial evidence of malice to support the second degree murder conviction.

**Request for Jury Instruction on Voluntary Manslaughter (Heat of Passion)**

Campbell contends the trial court erred in denying her request for a jury instruction on voluntary manslaughter based on provocation and heat of passion.

The omitted instruction—CALCRIM No. 570—provides:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether provocation was sufficient, consider whether a person of average disposition, in

12

the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

**Proceedings below**

Immediately before the parties were to begin closing arguments, and after the trial court read the instructions to the jury, Campbell's counsel informed the trial court he wanted to "add" CALCRIM No. 570 and stated he believed he had requested the instruction earlier. The court stated it recalled defense counsel requesting the instruction at some point, but believed counsel had withdrawn the request because counsel did not mention the instruction when the court reviewed with the parties the instructions it planned to give. The court denied the request and told the parties it would state its reasons on the record before the end of trial.

The trial court revisited the issue prior to Campbell's argument to the jury, after the prosecutor made her opening argument and the court excused the jury for the evening recess. In support of the request for CALCRIM No. 570, Campbell's counsel stated:

"On the heat of passion, the thing is, Leroy Jefferson testified before this incident, they were arguing; and so did Markael Ballou, he said they were arguing and they had to be separated by Leroy Jefferson.

"Erica Campbell's statement before the stabbing, there was an argument and even Marcus Evans who said he wasn't present but he heard some type of rumble or whatever, prior to him believing that Mr. Taylor had been struck with the knife; so with that regard, and with Erica Campbell's statement also, that she was pushed beforehand, beate[n] to the ground -- or not the ground, is basically some argument in heat of passion right before

13

that.  And whether or not that is adequate provocation, that is something that the jury should be able to weigh."

The trial court asked defense counsel:  "You're focusing on either the push where she moved a little bit or the subsequent testimony of her that she was pushed and fell down?  Either one of those two versions is sufficient provocation for heat of passion?"  Defense counsel answered affirmatively, adding, "Also combined with the argument that all the other witnesses said was occurring immediately before that."

The trial court ruled there was insufficient evidence of provocation to warrant instructing the jury with CALCRIM No. 570.  The court stated, "the appropriate instruction is only a self-defense one."  The trial court instructed the jury on self-defense and imperfect self-defense.

**Applicable law**

An "intentional killing is reduced to voluntary manslaughter if other evidence negates malice.  Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation ([Pen. Code,] § 192, subd. (a))."  (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.)  "'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.]  "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'"'"  (*Id*. at pp. 583-584.)  "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection."  (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

Voluntary manslaughter is a lesser included offense of murder.  (*People v. Breverman* (1998) 19 Cal.4th 142, 153.)  A trial court errs if it fails to instruct "on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such

14

evidentiary support." (*Id.* at p. 162.)[7] The "existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed." (*Ibid.*)

"In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) "On appeal, we apply a de novo standard of review." (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 581.)

**Analysis**

The record does not contain substantial evidence indicating Campbell was feeling any "violent or intense emotion" at the time she stabbed Taylor. (CALCRIM No. 570.) At trial, Campbell testified that when Taylor pushed her in the kitchen she "felt a little scared because a few minutes prior to that, he had choked [her.]" She further testified that after Taylor pushed her, her "physical instinct was to protect [herself]." She also testified that at the time she stabbed Taylor, she was experiencing a "blackout" as a result of her alcohol consumption. Absent from the record is evidence indicating that at the time Campbell stabbed Taylor, she was feeling some violent or intense emotion that "'""would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.""' [Citation.]'" (*People v. Manriquez*, *supra*, 37 Cal.4th at pp. 583-584.)

---

[7] In *People v. Breverman*, *supra*, the California Supreme Court addressed the trial court's sua sponte duty to instruct on a lesser included offense. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) The principles set forth in *Breverman* also are applicable here where Campbell requested an instruction on a lesser included offense and the trial court refused to give it. (See *People v. Elize* (1999) 71 Cal.App.4th 605, 611.)

As discussed above, "Heat of passion has both objective and subjective components." (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.'" (*Ibid*.) Based on Campbell's statements to Detective Uribe and her trial testimony, she was not under the actual influence of a strong passion at the time she stabbed Taylor. She maintains she stabbed him in self-defense. The trial court did not err in declining to instruct the jury on heat of passion with CALCRIM No. 570.

**Presentence Custody Credits**

Campbell is entitled to presentence custody credit for all days she spent in custody prior to sentencing. (Pen. Code, § 2900.5, subd. (a).)

Campbell's probation report lists the date of her arrest as April 4, 2012. The trial court sentenced her on April 23, 2014. Thus, the court awarded Campbell 750 days of presentence custody credit—the total number of days she spent in custody from April 4, 2012 to April 23, 2014.

At trial, Detective Uribe testified he booked Campbell for murder on April 2, 2012. She was in jail from April 2 to April 4, 2012. Detective Uribe released Campbell from custody on April 4, 2012 to gather additional information. She was rearrested later the same day. As the Attorney General concedes, Campbell is entitled to custody credit for April 2 and 3, 2012, for a total award of 752 days of actual presentence custody credit.

## DISPOSITION

The trial court is ordered to correct the judgment to reflect that Campbell is awarded 752 days of actual presentence custody credit. As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

CHANEY, J.

I concur:

JOHNSON, J.

17

ROTHSCHILD, P. J., Dissenting.

I disagree with the majority's conclusion that there was insufficient evidence to support a voluntary manslaughter instruction for heat of passion. In determining whether such an instruction is warranted, we must consider not only the moment immediately preceding the killing, but also the past history of provocation between the parties. "The provocative conduct [sufficient to reduce a killing from murder to manslaughter] may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time." (*People v. Le* (2007) 158 Cal.App.4th 516, 528.) Thus, in *People v. Borchers* (1958) 50 Cal.2d 321, the court held that a long history between the defendant and the victim was relevant to the issue of a heat-of-passion defense. "From the evidence viewed as a whole the trial judge could well have concluded that defendant was roused to a heat of 'passion' by a series of events over a considerable period of time: [The victim's] admitted infidelity, her statements that she wished she were dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that defendant shoot her, [her child], and himself on the night of the homicide, and her taunt, 'are you chicken.'" (*Id.* at pp. 328-329.) Furthermore, a heat-of-passion instruction may be appropriate even where there was a time gap between the primary provocations and the killing. (See, e.g., *People v. Berry* (1976) 18 Cal.3d 509, 515-516 [heat-of-passion instruction proper where defendant lay in wait for victim for 20 hours, before the victim triggered the defendant's rage again by screaming at him].)

Nor is it dispositive that Campbell claimed that she acted in self-defense, rather than in a heat of passion. As the Supreme Court has held, "the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*People v. Breverman* (1998) 19 Cal.4th 142, 162-163; accord *People v. Barton* (1995) 12 Cal.4th 186, 194-195.) The Court explained that "[t]his means that substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to

instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the states of mind on which these theories depend were absent." (*People v. Breverman*, *supra*, at p. 163 fn. 10.)

Indeed, an instruction on heat of passion need not be in tension with an instruction on perfect or imperfect self-defense: "'"[I]n the usual case,"' a heat-of-passion instruction '"supplements the self-defense instruction."'" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1138.) This is because when a person is in a situation in which she believes she must kill in order to protect her own life, she is often involved in a confrontation that would arouse the passions of a reasonable person. For example, in *People v. Thomas* (2013) 218 Cal.App.4th 630, the court held that the trial court had erred by failing to instruct the jury on a heat-of-passion theory of manslaughter. The court described the circumstances of that case as follows: "All the witnesses agree that minutes before he killed [the victim] Navarro, [the defendant] Thomas had been involved in an argument and physical altercation with the Ortiz brothers and Navarro. Ignacio Ortiz described the argument as 'pretty heated,' and another witness characterized the event leading up to the shooting as a tussle and commotion. The Ortiz brothers and Navarro got the better of Thomas, and various accounts have him crying, calling out for his father or being dragged across the apartment parking lot. Shortly before the shooting, Thomas was seen pacing in the parking lot and he seemed angry. Once he retrieved the assault weapon from his car, his father was trying to calm him down. That is when Navarro approached. Thomas says Navarro lunged at him, and he pulled the trigger. Thomas thought Navarro was going for the gun, and said he did not intend to fire. He fired because he was afraid, nervous and not thinking clearly. Although these facts may fit more precisely with a homicide mitigated by imperfect self-defense, we cannot rule out that they may also show that Thomas was guilty only of voluntary manslaughter because when he shot Navarro his passion was aroused and his reason was obscured due to a sudden quarrel." (*Id.* at p. 645.)

In this case, although Campbell testified that she acted in self-defense when she stabbed Taylor, there was evidence supporting a heat-of-passion theory. Campbell

2

testified that Taylor had a history of abusing her. They had fought almost daily since moving into an apartment together two months earlier, including multiple occasions when Taylor choked her and threw her into a wall. Campbell and Taylor had argued heatedly both before Taylor and his friends went out drinking and after they returned. Campbell testified that, shortly before the stabbing, she had fought with Taylor in their bedroom. He twisted her arm, threw her to the floor multiple times, choked her, and threw her into a wall. His violence terrified her. Taylor followed Campbell to the kitchen, started arguing with her again, and pushed her. Then she picked up the knife.

It is not our function to weigh this evidence. Instead, "we review the evidentiary support for an instruction 'in the light most favorable to the defendant' [citation] and should resolve doubts as to the sufficiency of the evidence to warrant instructions '"in favor of the accused."'" (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.) Moreover, "in California the law of provocation focuses on '"emotion reasonableness"' (i.e., 'whether "the defendant's *emotional* outrage or *passion* was reasonable"'), not on '"act reasonableness"' (i.e., 'whether "a reasonable person in the defendant's shoes would have responded or *acted* as violently as the defendant did[]"')[.] [Citations.] We assess the emotional profile of the defendant and its connection to the reasonableness of her reaction to the provocation rather than whether it was reasonable for her to kill under the circumstances." (*Id.* at pp. 1481-1482.)

According to the facts as Campbell described them, she was subjected to physical and emotional abuse almost daily for two months. The last act of abuse occurred shortly before the stabbing. When Taylor followed her to the kitchen and shoved her one last time, she responded by stabbing him. This was sufficient provocation to "cause an emotion so intense that an ordinary person would simply *react,* without reflection." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.) Campbell was entitled to an instruction on heat-of-passion manslaughter. For this reason, I respectfully dissent.


ROTHSCHILD, P. J.

3